```
                                      FILED

                                   AUG - 3 2011

                         UNITED STATES BANKRUPTCY COURT
                         EASTERN DISTRICT OF CALIFORNIA
```

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| In re: | ) | Case No. 09-33808-D-11 |
| | ) | |
| KIP SKIDMORE and ILLA A. | ) | Docket Control No. PA-18 |
| SKIDMORE, | ) | |
| | ) | Date:  July 13, 2011 |
| Debtors. | ) | Time:  10:00 a.m. |
| | ) | Dept:  D |
| | ) | |
| | ) | |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

<u>MEMORANDUM DECISION</u>

On March 18, 2011, Pino & Associates filed an application for a first and final allowance of compensation for services rendered as counsel for Kip and Illa Skidmore as debtors in possession in this case.  On May 12, 2011, Pino & Associates filed a supplement to the application; collectively, the application and the supplement will be referred to as the "Application."  The United States Trustee, a group of creditors referred to as the Cushman-Creekside investors, and Mark M. Garay, Trustee of the Mark M. Garay Revocable Trust, oppose the Application, as discussed below.  For the reasons set forth below, the court will grant the Application in part.

## I.   AMOUNT OF COMPENSATION REQUESTED

Pino & Associates originally sought an award of attorney's fees in the amount of $318,002.50 and reimbursement of costs in the amount of $18,611.46, for a total of $336,613.96.   In the supplement, Pino & Associates requests approval of an additional $27,987.50 in fees and $716.54 in costs, a total of $28,704.04, incurred in supplementing the original application (and also in connection with implementation of the confirmed plan).   Thus, the total sought is $365,318, reduced to $365,273 by way of a notice of errata filed June 1, 2011.

## II.   BACKGROUND

From the day this case was commenced, it was clear this was going to be a liquidating chapter 11 case with a "pot plan;" that is, a finite source of funds to be divided among creditors, as opposed to one involving an ongoing business or ongoing funding. In addition, since the very early stages of the case, all the major creditors were represented by competent and experienced bankruptcy counsel.

Very early on in the case, at the initial status conference, a hearing where many of the active creditors were represented by counsel, the court inquired whether creditors might be better served if the case were converted to chapter 7, and clearly conveyed to the creditors that the court would seriously consider a motion to convert.

However, all the creditors allowed the case to proceed without seeking conversion, and the debtors filed a liquidating "pot plan."   The initial plan and disclosure statement were hotly contested and objected to by multiple creditors.   In addition,

- 2 -

the objecting creditors were demanding significant financial
information from the debtors and their financial advisors,
Development Specialists, Inc. ("DSI") in order to assess the plan
and decide whether to accept or reject it.

In a case like this one, with multiple players, the court
sees only the tip of the iceberg, and is very aware that many
things play out behind the scenes.  It is clear in this case that
various creditors and creditor groups had their own agendas, and
that, even though a pot plan would result in a de minimis
distribution on unsecured claims, there were other considerations
that went into the creditors' decisions as to whether to let the
debtors continue in the chapter 11 or seek to have the case
converted.

At the hearings on Pino & Associates' and DSI's fee
applications, one of the most vocal creditors objecting to the
fees, the Cushman-Creekside investor group, acknowledged that at
all stages of the chapter 11 case, they made the business
decision not to seek conversion, but rather, to keep the case in
chapter 11.

The amended plan that was eventually sent out for voting
specifically referenced the professional fees of Pino &
Associates and DSI.  In regard to Pino & Associates' fees, the
plan stated that "[i]t is estimated that . . . the fees of Pino &
Associates will not exceed $250,000,"[1] and in regard to DSI, the
plan stated that "the fees and costs of DSI may exceed

_____

1.  Modified Second Amended Plan of Reorganization Proposed
by Debtors, filed November 10, 2010 ("Plan"), 17:21-22.

- 3 -

$500,000.00 through the date of confirmation."[2] [3] The plan also contained language advising that "[i]t is anticipated that at best, the unsecured creditors will receive approximately two (2) cents on the dollar on account of their claims."[4]

Even with the above disclosures in the plan, all the creditors now objecting to the fee applications voted to accept the plan, and the plan was confirmed by the unanimous acceptance of all classes.  The class of general unsecured claims accepted the plan by a vote of 22 to 2 in number and $43,513,332 to $3,300,000 in amount.

## II.   ANALYSIS

### A.   Standards for Evaluating Fee Applications

The Motion is brought pursuant to 11 U.S.C. § 330.[5]  Section 330(a)(3) sets out the standards by which courts should determine the reasonableness of compensation of professional persons. Reasonableness is determined by considering the nature, extent, and value of the services rendered, taking account of all relevant factors, including the time spent; the rates charged; whether the services were necessary to the administration of, or beneficial at the time they were rendered toward the completion of the case; whether the services were performed within a

---

2.   Id., 18:3-5.

3.   As to Pino & Associates, the estimate related only to fees; as to DSI, it related to fees and costs.

4.   Plan, 29:22-23.

5.   Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.  All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

- 4 -

1  reasonable amount of time commensurate with the complexity,
2  importance, and nature of the problem, issue, or task addressed;
3  whether the professional is board certified or otherwise has
4  demonstrated skill and experience in the bankruptcy field; and
5  the customary compensation of comparably skilled attorneys in
6  other types of cases.  § 330(a)(3); see In re Eliapo, 298 B.R.
7  392, 401 (9th Cir. BAP 2003), rev'd in part on other grounds, 468
8  F.3d 592 (9th Cir. 2006).  The court shall not allow compensation
9  for unnecessary duplication of services or services that were not
10  reasonably likely to benefit the estate or necessary to the
11  administration of the case.  § 330(a)(4).
12  **B.  Nature, Extent, and Value of the Services**
13     This was a contentious case from the beginning.  The plan
14  confirmation process was lengthy and entailed prolonged
15  negotiations with a variety of creditors.  As Pino & Associates
16  points out, it did not have the advantage of a creditors'
17  committee acting as a cohesive group, but had to deal separately
18  with each creditor's counsel.  Further, in contrast to the more
19  common case, where general unsecured creditors have similar
20  interests and concerns, the creditors in this case actively
21  pursued their own individual interests.  The original disclosure
22  statement drew nine separate objections.
23     After a number of continued hearings, the debtors were able
24  to obtain confirmation of a plan by the consent of all voting
25  classes.  It is obvious that to obtain confirmation, the debtors
26  and Pino & Associates had to cut deals with a variety of
27  creditors, one of them Garay himself, whose deal with the debtors
28  / / /

- 5 -

involved not just the amounts of his several claims, but mutual
releases resolving significant pre-petition litigation.

Ms. Pino skillfully handled the administration of this case
and did a commendable job of shepherding the plan to
confirmation.  The court concludes that her firm's services were
necessary to the administration of, and beneficial at the time
they were rendered toward the completion of, the case.

## C.  The Objections

After-the-fact, the Cushman-Creekside investors complain
that the fees and costs sought by Pino & Associates and DSI would
reduce by two-thirds the amount of the "friends and family fund"
from which creditors will be paid.  Cushman-Creekside concludes
creditors would have been better off in a chapter 7 or a true
liquidating chapter 11 than under the confirmed plan -- the plan
they voted for.

This argument is based on the apparent $1,012,000 equity in
the debtors' Hermosa Beach property (net of costs of sale);
Cushman-Creekside argues that had the case been converted early
on, creditors would have realized much of that value because the
property would have been liquidated and the proceeds paid out to
creditors without the intervention of Pino & Associates' and
DSI's professional fees.

Pino & Associates responds that the outcome of a chapter 7
liquidation was uncertain, particularly in light of the debtors'
indemnification agreements with the companies that had bonded the
jobs of Sierra National Construction, Inc. ("SNC"), the debtors'
corporation.  The objecting parties did not mention this issue,
either in their briefing on the fee applications or at the

- 6 -

1 hearing, except to speculate that a chapter 7 trustee would have

2 abandoned the debtors' SNC stock.  This, together with the

3 failure of any creditor to move for conversion after the court

4 had indicated it would seriously consider such a motion, suggests

5 that creditors shared the debtors' concerns about these potential

6 additional bonding company claims.

7     Further, the Cushman-Creekside investors' argument assumes

8 the Hermosa Beach property would have sold for $1,100,000 within

9 a reasonable time frame.  Also, in order to conclude that chapter

10 7 would have been the better alternative (against the apparent

11 wisdom of the creditors in voting for the plan), the court would

12 have to find that the sale would have generated no capital gains

13 tax liabilities.  The parties have not addressed this issue.

14     The Cushman-Creekside investors also complain about Pino &

15 Associates' fees incurred in connection with the Garay adversary

16 proceeding.  First, they argue that the fees incurred in

17 defending the debtors' right to a discharge did not result in a

18 benefit to the estate.  This argument goes too far, as it would

19 always deprive debtors in individual chapter 11 cases of the

20 ability to defend discharge and dischargeability complaints.

21     Second, Cushman-Creekside contends creditors did not benefit

22 from litigation of the debtors' preference claims against Garay

23 because those claims were ultimately dropped as a part of the

24 debtors' settlement with Garay.  This argument is unsound because

25 it would require the court to single out one particular aspect of

26 an overall settlement of multiple claims by Garay against the

27 debtors and vice versa, without considering the benefits of the

28 settlement as a whole.  In this regard, as with the creditors'

- 7 -

1 decision not to seek conversion, the creditors' votes for the

2 plan, which contained the Garay settlement, suggest the benefits

3 outweighed the detriments.

4        Finally, the Cushman-Creekside investors observe, correctly,

5 that the treatment of unsecured creditors in the confirmed plan

6 differed little from that proposed in the original plan.   The

7 original plan proposed a $1.7 million "pot" for the unsecured

8 creditors; the confirmed plan provides for $1.75 million.   At the

9 same time, Pino & Associates' and DSI's fees and costs increased

10 dramatically.   In other words, had creditors accepted the

11 original plan, they would have been better off.   They did not;

12 instead they sought repeated revisions to DSI's asset valuations

13 as a condition to accepting the plan.

14        First, creditors must have anticipated that the additional

15 work they were insisting on would generate significant increases

16 in professional fees.   Second, the steady increase in the

17 professional fees was revealed by the changes to the plan.   The

18 original plan estimated the claims would be a "hoped-for"

19 $150,000 for Pino & Associates and in excess of $250,000 for DSI,

20 whereas the confirmed plan stated that Pino & Associates'

21 compensation would not exceed $250,000 and DSI's fees and costs

22 may exceed $500,000 through confirmation.   And third, the

23 creditors were almost certainly aware that Pino & Associates was

24 having to negotiate with each of them individually.

25        In short, creditors must have known, as Ms. Pino observed at

26 the hearing, how expensive the process was becoming.   Yet they

27 allowed Pino & Associates to continue on that path, spending

28 substantial time and effort to confirm a plan, and in fact,

- 8 -

invited greater and greater expenditures of time with regard to
the updating of the asset valuations, and then they voted for the
plan.   That they made those decisions, apparently for their own
business reasons, undercuts their current argument that Pino &
Associates should not be compensated for those efforts.

The United States Trustee, the Cushman-Creekside investors,
and Garay all object that many of the services performed by Pino
& Associates and DSI were duplicative.   The most glaring example
is that Pino & Associates spent 577.9 hours on the various
versions of the plan and disclosure statement, billing a total of
$181,602.50, and DSI billed 243.7 hours on the plan and
disclosure statement, for a total of $139,258.50, for a combined
total of over $320,000.

Pino & Associates responds that there is no evidence of
duplication of effort, and that Pino & Associates and DSI had
distinct roles.   For example, Pino & Associates contends DSI
performed asset valuations whereas Pino & Associates prepared the
plans and disclosure statements using DSI's data.

This conclusion is plainly not accurate.   As will be
discussed in the court's memorandum decision on DSI's fee
application, DSI's involvement in the case went far beyond the
asset valuations and well into the legal arena.   Having closely
inspected both firms' billing statements, the court concludes
that there was a significant amount of duplication of effort and
resulting charges.   However, the consequence properly falls
primarily on DSI rather than on Pino & Associates.   It was DSI
that injected itself into the legal aspects of the case.   Pino &
/ / /

1  Associates properly did not unnecessarily involve itself in
2  preparing the asset valuations.

3        Further, the court does not agree with Garay that Pino &
4  Associates is chargeable with a failure to supervise DSI and
5  control its billings.  To the contrary, Pino & Associates had the
6  responsibility of keeping the case moving forward; toward that
7  end, as a result of creditor demands, Pino & Associates needed
8  DSI's revised asset valuations.  Disruption of DSI's relationship
9  to the case may well have jeopardized those efforts.

10        Finally, the United States Trustee points out a number of
11  instances in which Pino & Associates' time entries are alleged to
12  be vague, to consist of several tasks "lumped" together, or to be
13  for non-compensable clerical tasks.  The court finds the most
14  significant of these to be Pino & Associates' practice of billing
15  at paralegal rates for services that are purely secretarial or
16  clerical in nature, and thus, are not compensable.  See Sousa v.
17  Miguel, 32 F.3d 1370, 1374 (9th Cir. 1994).  This is a practice
18  the court will not condone, and the court does not agree with Ms.
19  Pino's position that the importance of these tasks somehow takes
20  them out of governing authority in this case or in cases in which
21  her firm is involved.  These tasks are important in any
22  bankruptcy case; they are clerical tasks nonetheless, and
23  precisely the type of services courts routinely hold to be non-
24  compensable.[6]

25

26 _____
        6.  See In re Stewart, 2008 Bankr. LEXIS 4706, *20 (9th Cir.
27  BAP 2008); In re Schneider, 2007 Bankr. LEXIS 3118, *11 (Bankr.
    N.D. Cal. 2007); In re Dimas, LLC, 357 B.R. 563, 577 (Bankr. N.D.
28  Cal. 2006); In re SonicBlue Inc., 2006 Bankr. LEXIS 1576, *14
    (Bankr. N.D. Cal. 2006).

1    However, reductions on account of these charges and those
2    incurred in preparing the supplement to the original application,
3    to which the United States Trustee also objects, would not bring
4    the award down to the $250,000 level the court intends to award.
5    **D.   The Plan Projection**
6        As indicated above, this case involved a "pot plan," in
7    which allowed administrative expenses will be paid in full from
8    the "pot" before unsecured creditors receive anything.   Thus,
9    particularly in this type of plan, accurate estimates of
10   professional fees are critical for creditors to determine what
11   will trickle down to the unsecured claims.   If creditors are to
12   be able to rely on these estimates in deciding whether to vote
13   for the plan, the estimates must "have teeth."   The professionals
14   in the case were the only ones with the ability to control the
15   amount of information that goes into the plan before it is sent
16   out for voting.   Pino & Associates drafted the plan creditors
17   voted on, in which it stated its fees would not exceed $250,000.
18   Pino & Associates made no subsequent disclosure that its fees
19   would in fact exceed that amount.
20                        **IV.   CONCLUSION**
21       Based on Pino & Associates' representation in the plan that
22   its fees would not exceed $250,000, the court feels constrained
23   to limit its fees to that amount.   As costs were not part of the
24   estimate, the court will also award Pino & Associates its costs,
25   in the amounts requested, $18,611.46 (original application) plus
26   $716.54 (supplement), a total of $19,328.   The total award will
27   be $269,328.
28   / / /

                              - 11 -

1       The court will issue an appropriate order.

2
    Dated: __Aug. 3__ , 2011            *Robert Bardwil*
3                                       ROBERT S. BARDWIL
                                        United States Bankruptcy Judge
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**

**CERTIFICATE OF MAILING**

    The undersigned deputy clerk in the office of the United States Bankruptcy Court for the Eastern District of California hereby certifies that a copy of the document to which this certificate is attached was mailed today to the following entities at the addresses shown below or on the attached list.

John Moe
777 S Figueroa #3200
Los Angeles, CA 90017-3101

Peter Bronson
770 L Street, Suite 950
Sacramento, CA 95814

Robert Trodella
555 California St 26th Fl
San Francisco, CA 94104

Vikas Kumar
501 I St #7-500
Sacramento, CA 95814

Stephen Reynolds
424 2nd St #A
Davis, CA 95616

Estela Pino
800 Howe Ave #420
Sacramento CA 95834

Illa Skidmore
2705 Sierra View Trail
Carmichael, CA 95608

Kip Skidmore
2705 Sierra View Trail
Carmichael, CA 95608

Aaron Avery
2150 River Plaza Dr #450
Sacramento CA 95833

Development Specialists, Inc.
c/o William A. Brandt
3 1st National Plaza
70 W Madison St #2300
Chicago IL 60602

Peter J. Benvenutti
Jones Day
555 California St
San Francisco CA 94104

**DATED:** 8.3.11

**By:** *Nicky Clark*
**Deputy Clerk**

EDC 3-070 (Rev. 6/28/10)