FILED

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

AUG 08 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 09-33808-D-11 |
| KIP SKIDMORE and ILLA A. SKIDMORE, | Docket Control No. PA-20 |
| Debtors. | Date:  July 13, 2011<br>Time:  10:00 a.m.<br>Dept:  D |

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

<u>**MEMORANDUM DECISION**</u>

On March 18, 2011, Development Specialists, Inc. ("DSI") filed an application for a second and final allowance of compensation for services rendered as financial advisor for Kip and Illa Skidmore as debtors in possession in this case.  On May 12, 2011, DSI filed an amended application; collectively, the original and amended applications will be referred to as the "Application."  The United States Trustee, a group of creditors referred to as the Cushman-Creekside investors, and Mark M. Garay, Trustee of the Mark M. Garay Revocable Trust, oppose the Application, as discussed below.  For the reasons set forth below, the court will grant the Application in part.

**I.   AMOUNT OF COMPENSATION REQUESTED**

DSI originally sought an award of fees in the amount of $650,786 and reimbursement of costs in the amount of $23,882.03,

1  for a total of $674,668.03 for the billing period July 2, 2009
2  through December 10, 2010.

3      In the amended application, DSI extended the billing period
4  through March 31, 2011, excluded certain entries it had decided
5  should not be billed, and made some significant but unexplained
6  adjustments to the amounts listed in the various categories set
7  up by the United States Trustee's guidelines.  The amounts now
8  requested are $658,346.50 in fees and $24,087.76 in costs, a
9  total of $682,434.26.  Of this amount, a total of $161,979.03 was
10 billed during the period July 2, 2009 through December 31, 2009
11 and was the subject of an application for a first interim award;
12 the balance, $520,455.23, is for the period January 1, 2010
13 through March 31, 2011.

14                    **II.   BACKGROUND**

15     From the day this case was commenced, it was clear this was
16 going to be a liquidating chapter 11 case with a "pot plan;" that
17 is, a finite source of funds to be divided among creditors, as
18 opposed to one involving an ongoing business or ongoing funding.
19 In addition, since the very early stages of the case, all the
20 major creditors were represented by competent and experienced
21 bankruptcy counsel.

22     Very early on in the case, at the initial status conference,
23 a hearing where many of the active creditors were represented by
24 counsel, the court inquired whether creditors might be better
25 served if the case was converted to chapter 7, and clearly
26 conveyed to the creditors that the court would seriously consider
27 a motion to convert.
28 / / /

- 2 -

1    However, all the creditors allowed the case to proceed

2  without seeking conversion, and the debtors filed a liquidating

3  "pot plan."  The initial plan and disclosure statement were hotly

4  contested and objected to by multiple creditors.  In addition,

5  the objecting creditors were demanding significant financial

6  information from the debtors and DSI in order to assess the plan

7  and decide whether to accept or reject it.

8    In a case like this one, with multiple players, the court

9  sees only the tip of the iceberg, and is very aware that many

10  things play out behind the scenes.  It is clear in this case that

11  various creditors and creditor groups had their own agendas, and

12  that, even though a pot plan would likely result in a de minimis

13  distribution on unsecured claims, there were other considerations

14  that went into the creditors' decisions as to whether to let the

15  debtors continue in the chapter 11 or seek to have the case

16  converted.

17    At the hearings on DSI's fee application and that of the

18  debtors' counsel, Pino & Associates, one of the most vocal

19  creditors objecting to the fees, the Cushman-Creekside investor

20  group, acknowledged that at all stages of the chapter 11 case,

21  they made the business decision not to seek conversion, but

22  rather, to keep the case in chapter 11.

23    The amended plan that was eventually sent out for voting

24  specifically referenced the professional fees of Pino &

25  Associates and DSI.  In regard to Pino & Associates' fees, the

26  plan stated that "[i]t is estimated that . . . the fees of Pino &

27

28

- 3 -

Associates will not exceed $250,000,"[1] and in regard to DSI, the plan stated that "the fees and costs of DSI may exceed $500,000.00 through the date of confirmation."[2] [3] The plan also contained language advising that "[i]t is anticipated that at best, the unsecured creditors will receive approximately two (2) cents on the dollar on account of their claims."[4]

Even with the above disclosures in the plan, all the creditors now objecting to the fee applications voted to accept the plan, and the plan was confirmed by the unanimous acceptance of all classes. The class of general unsecured claims accepted the plan by a vote of 22 to 2 in number and $43,513,332 to $3,300,000 in amount.

### III. ANALYSIS

#### A. Standards for Evaluating Fee Applications

The Motion is brought pursuant to 11 U.S.C. § 330.[5] Section 330(a)(3) sets out the standards by which courts should determine the reasonableness of compensation of professional persons. Reasonableness is determined by considering the nature, extent, and value of the services rendered, taking account of all relevant factors, including the time spent; the rates charged;

---

1. Modified Second Amended Plan of Reorganization Proposed by Debtors, filed November 10, 2010 ("Plan"), 17:21-22.

2. Id., 18:3-5.

3. As to Pino & Associates, the estimate related only to fees; as to DSI, it related to fees and costs.

4. Plan, 29:22-23.

5. Unless otherwise indicated, all Code, chapter, and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

- 4 -

whether the services were necessary to the administration of, or beneficial at the time they were rendered toward the completion of the case; whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; whether the professional is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and the customary compensation of comparably skilled attorneys in other types of cases.  § 330(a)(3); see In re Eliapo, 298 B.R. 392, 401 (9th Cir. BAP 2003), rev'd in part on other grounds, 468 F.3d 592 (9th Cir. 2006).  The court shall not allow compensation for unnecessary duplication of services or services that were not reasonably likely to benefit the estate or necessary to the administration of the case.  § 330(a)(4).

**B.   Nature, Extent, and Value of the Services -- Summary**

   This was a contentious case from the beginning.  The plan confirmation process was lengthy and entailed prolonged negotiations with a variety of creditors.  The court recognizes that DSI played a significant role in compiling and disseminating information that the creditors were requesting or demanding, and that DSI ultimately played a role in obtaining confirmation of the plan.  Thus, some portion of the firm's services were necessary to the administration of, or beneficial at the time they were rendered toward the completion of, the case.

   With the above said, the court observes that DSI was very aggressive in its billing, failed to use good billing judgment in handling this case, and did not delegate work in a prudent manner.  William Brandt, the highest paid person working on the

1  case (and apparently, one of the highest paid in the firm),
2  regularly handled routine matters.  He also billed to review work
3  done by other highly paid professionals at DSI and by the
4  debtors' competent and experienced counsel.  This led to
5  duplication of efforts and the running up of unnecessary fees.
6  **C.   The Objections**
7       The United States Trustee, the Cushman-Creekside investors,
8  and Garay all object that many of the services performed by Pino
9  & Associates and DSI were duplicative, and that the total
10 professional fees are disproportionate to both the size and
11 complexity of the case and to any benefit achieved for unsecured
12 creditors.  DSI responds that, as non-attorneys, its
13 professionals could not have duplicated the services of the
14 debtors' counsel, that Mr. Brandt's unique expertise -- his
15 particular "skill set" -- was necessary in virtually every aspect
16 of the case, in addition to that of Ms. Pino, and that the only
17 alternative to the work DSI did and to the accumulation of fees
18 by both DSI and Pino & Associates would have been to "pull the
19 plug" on the case and allow it to be converted to chapter 7,
20 which would have been a far less favorable outcome.
21       As explained in its memorandum decision on Pino &
22 Associates' fee application, the court agrees that the outcome of
23 a chapter 7 case was uncertain at best.  The court is persuaded
24 by the failure of any of the creditors to seek conversion,
25 despite their awareness that fees were running up on the part of
26 both DSI and Pino & Associates and despite the court's
27 indications that it would seriously consider a motion to convert.
28       The court does not agree, however, that pulling the plug was

1  the only alternative to running up the level of professional fees
2  that resulted in this case.  Instead, DSI at all times had the
3  option, and indeed the duty, to exercise reasonable billing
4  judgment, to avoid duplication of effort -- both within its own
5  firm and with Pino & Associates, and to perform a cost-benefit
6  analysis on an ongoing basis to ensure its fees did not take on a
7  life of their own.

8  **1.  Failure to exercise good billing judgment**

9  The court will begin with the unusual amount of time charged
10 by DSI's president and CEO, and one of its most expensive
11 professionals, William Brandt, on such routine, in fact,
12 secretarial matters as coordinating telephone conversations among
13 himself, others within DSI, and/or the debtors' attorneys (see,
14 e.g., 1/4/10, 4/19/10 entries); determining available hearing
15 dates from the court's self-set calendar (see, e.g., 3/29/10
16 entries); and scheduling meetings prior to court hearings (see,
17 e.g., 6/8 and 6/9/10 entries).

18 This routine coordinating of telephone conversations and
19 meetings is symptomatic of a larger issue, one raised by Garay;
20 namely, that Mr. Brandt unnecessarily and unreasonably
21 micromanaged the case at a cost of $615 per hour.  For example,
22 in a single day, October 8, 2010, Mr. Brandt billed for 60
23 separate e-mail exchanges, mostly among the same people, when a
24 couple of phone calls would likely have accomplished the same
25 purpose at a much lower cost.[6]  This was not atypical -- Mr.

26 _____

27   6.  At the hearing, DSI's counsel pointed to Mr. Brandt's
   time entries for this particular day as evidence of his efforts
28 toward litigation support, strategy, and communication in
                                              (continued...)

1 Brandt's days included 20, 30, and often 40 e-mail exchanges.  In

2 fact, it is doubtful that an e-mail came in to or went out from

3 anyone in his firm to the debtors or their attorneys -- or

4 between any of the other professionals within the firm -- that

5 Mr. Brandt did not bill for reviewing.

6       Mr. Brandt has twisted the practice of billing in tenths of

7 an hour -- intended to ensure that professionals do not overbill

8 for their services -- to achieve the opposite result.  On June 8,

9 2010, he billed for the following exchange:

10        Review of an email from Kip Skidmore, this with
          respect to my attendance at the hearing tomorrow      0.10
11
          Further email back to Kip Skidmore, this confirming
12        I'll be at the hearing tomorrow                        0.10[7]

13      This probably consisted of "Are you going to be there?"  --

14 "Yes."  Yet Mr. Brandt billed the estate $123.  Mr. Brandt has

15 hundreds of entries billed at one-tenth of an hour, yet he <u>always</u>

16 bills separately -- at least one-tenth of an hour each -- for

17 reviewing and responding to an e-mail.  The example just quoted

18 is not an isolated instance, but is characteristic and

19 systematic.

20      **2.  Duplication of effort -- internal**

21      The time entries reveal a constant review and revision by

22 Mr. Brandt of the work performed by the senior consultants in his

23

24
_____

25        6.(...continued)
   attempting to resolve the creditor issues that stood as obstacles
   to the plan.  This argument is without merit.  Rather, it is an
26 example of the generalized and conclusory language that
   characterizes DSI's assessment of the value of its services.
27
        7.   Separate List of Exhibits in Support of Amended Second
28 and Final Fee Application of Development Specialists, Inc. for
   Compensation, filed May 13, 2011, Ex. 3, p. 27 of 243.

                              - 8 -

1  firm, Brian Calvert and Clare Pierce, and a lower-level
2  consultant, Matthew Farnsworth, who bill at $495, $435, and $225
3  per hour, respectively.[8]  There were frequent conversations and
4  meetings between and among them, together with e-mails and
5  virtually daily review by Brandt, with no explanation of why this
6  level of oversight of DSI's three other highly paid professionals
7  was necessary or reasonable.  These hourly rates, especially
8  Pierce's and Calvert's, are in the range of those charged by top-
9  notch professionals in this area; thus, their work should not
10 have to be systematically reviewed by someone charging even more.

11      Of the three billing levels in this case -- Brandt, at $615
12 per hour; Calvert and Pierce, at $495 and $435, respectively; and
13 Farnsworth, at $225 -- Brandt billed the most hours, 38% of the
14 total, and the most dollars, 52%.  Between them, Calvert and
15 Pierce billed 32% of the hours and 33% of the dollars;
16 Farnsworth, 29% of the hours and 14% of the dollars.  Simply put,
17 the court concludes that there was not a need for either the
18 inordinate amount of hands-on involvement of one of DSI's highest
19 billers, Mr. Brandt, or for four professionals billing at these
20 rates in addition to the debtors' counsel.

21      DSI responds, first, that because the retention agreement
22 disclosed that Mr. Brandt would be the principal consultant
23 working on the case, "there are no grounds to disallow fees that

24

_____

25      8.  For example, DSI's Pierce billed approximately 38 hours
    for drafting the initial disclosure statement, at $435 per hour,
26 and Mr. Brandt spent some 20 hours reviewing and revising
    Pierce's work on that project, at $615 per hour.  Pierce spent 10
27 hours drafting and editing the original version of the firm's
    second fee application, and Mr. Brandt billed 4.8 hours for
28 reviewing and revising it.  A remarkable amount of reviewing and
    revising by Mr. Brandt appears throughout the time entries.

1  he incurred instead of a less expensive colleague."[9]   Obviously,

2  this contention would write out of the Code the court's role in

3  evaluating the reasonableness of requested compensation.   Second,

4  DSI complains that the United States Trustee "had absolutely no

5  involvement in this case, and hence has no sense for case

6  dynamics or the complexities involved."[10]   The court, on the other

7  hand, has significant familiarity with the case and its progress,

8  and is not persuaded by DSI's conclusions:

9         Mr. Brandt has a particular depth of experience with
         individual chapter 11 cases, which was essential here
10        given the contentious nature of the Skidmore
         bankruptcy, and the fact that Mr. Skidmore sought to
11        confirm a plan without paying creditors in full.   It
         would not have demonstrated good billing judgment for
12        Mr. Brandt to play a secondary role in this case for
         cost purposes when his unique experience was an
13        important factor in his retention, and a central
         component of the successful plan that resulted.[11]
14

15  DSI repeatedly cites Mr. Brandt's depth of experience and

16  unique skills as supporting the necessity of its fees.   This

17  emphasis overlooks the fact that Mr. Brandt is compensated at a

18  level appropriate for someone with such experience and skills by

19  virtue of his hourly rate.   The court finds that, his skill and

20  experience notwithstanding, Mr. Brandt did not use prudent

21  business judgment in monitoring his involvement in the case.

22      In short, the heavy participation of not one but four

23  professionals at DSI, and Mr. Brandt's constant review of other

24

25  ─────────────────

26      9.   Response to United States Trustee's Opposition to
    Development Specialists, Inc.'s Amended Second and Final Fee
    Application, filed June 27, 2011 ("Response to UST"), 6:10-16.
27
        10.   Id., 6:17-18.
28
        11.   Id., 6:18-24.

1  professionals' work, are clear signs the case was systematically
2  overworked.

3      **3.  Duplication of services -- external**

4      This leads to the next charge of the objecting parties --
5  duplication in the services provided by DSI and those performed
6  by the debtors' counsel.  For example, the debtors' counsel spent
7  577.9 hours on the plan and disclosure statement, billing a total
8  of $181,602.50; according to DSI's amended second and final
9  application, DSI billed 243.7 hours on the same tasks, for a
10 total of $139,258.50.  This is in addition to the $269,776.50 DSI
11 billed for its various asset valuations ($45,480 for the first
12 interim period and $224,296.50 for the second).[12]

13     DSI contends that "the Debtors' bankruptcy counsel and
14 financial advisors cannot duplicate work in the same fashion as
15 can two lawyers."[13]  Thus, the argument goes, each contributed its
16 own expertise.

17 / / /

18 / / /

19

20     12.  These figures and others changed, some of them
dramatically, between DSI's original second and final application
21 and the amended version.  Thus, in the original version,
$148,309.50 was listed as the total for the plan and disclosure
22 statement work; in the amended version, this became $139,258.50.
A more significant change was made with respect to the "corporate
23 finance" work, by which DSI refers to its asset valuation work --
in the original application, $182,869.50; in the amended,
24 $224,296.50.

25     Further changes were made in an errata statement filed by
DSI on June 3, 2011, some of them sizeable indeed.  For example,
26 "267.80 hours and $148,309.50 (incorrect) to 17.60 hours and
$10,985.00 (correct)."  DSI has offered almost nothing in the way
27 of explanation, stating only that it had identified certain
clerical errors.
28
     13.  Response to UST, 4:22-23.

> Mr. Brandt was the primary negotiator with the creditors, the primary contact with the Debtors, and the primary interface with Debtors' counsel regarding all business issues and their various interrelationships with Debtors' potential future and [sic] ability to repay the friends and family loans so the Plan could succeed.  Mr. Brandt's team at DSI assisted in these tasks.  Pino & Associates, as Debtors' counsel, was responsible for providing legal advice and expertise and drafting the various motions and orders necessary to the day-to-day running of a chapter 11 case.  Because of these unique skills, and each professional's contribution to the efficient and effective reorganization of the Skidmore estate, there was no duplication of effort . . . .[14]

DSI's counsel furthered this argument at the hearing by referring to the unique skill set financial advisors bring to the restructuring of debts.  He cited structuring the plan from a business aspect, developing and implementing the strategy for getting the friends and family loans, evaluating negotiating positions, listening to creditors and understanding what they are really asking for, and providing them with the information they need.

However, these things are also what a chapter 11 debtor's attorney does.  Given the experience and ability of the debtors' lead attorney, Ms. Pino, and considering the issues in this case and the positions of the various creditors, the court is not persuaded that DSI's unique expertise was required at the levels at which it was applied.  The court does not question Mr. Brandt's skill, and DSI may have appropriately utilized him for certain aspects of the case, especially the analysis of the business operations of the debtors' affiliate companies and the valuation of their other assets.  But DSI and Mr. Brandt were

---

14.  Id., 4:25-5:7.

1 being compensated very well for that expertise by virtue of Mr.

2 Brandt's hourly rate.   There was no need for his hyperactive

3 involvement in everything from fee applications to claim

4 objections, document production requests, Garay's motion for

5 temporary allowance of his claim, Garay's dischargeability

6 complaint, and creditor negotiations.

7     DSI refers to its dealings with the various creditors and

8 their "demands" under the heading "Herding the Cats."[15]

9     With creditors having understood that the global payout
      was always going to be small based on the ratio of
10    assets to liabilities, many chose to break from the
      others to advance their individual interests so as to
11    gain separate leverage, and possibly a better deal for
      themselves when measured against what would be paid in
12    the entirety.[16]

13     Thus, DSI engaged in "an almost daily interface among DSI on

14 the one hand, and the creditors on the other."[17]   The specifics

15 cited by DSI do not support the conclusion of a "free-for-all"[18]

16 by the creditors that required DSI's unmonitored participation.

17 DSI mentions only Umpqua Bank's contention that a portion of its

18 claim was secured, Garay's pursuit of a non-dischargeability

19 action, and Umpqua Bank's, Garay's, and the Cushman investors'

20 demands for re-appraisals of the assets.   Except for the updates

21 of the asset valuations, this work was well within Ms. Pino's

22 wheelhouse.   So far as the record reveals, there was no reason a

23 _____

24    15.   Combined Response to Mark M. Garay, Trustee, and
   Cushman-Creekside Investors, LP's Objections to Second and Final
25 Application of Development Specialists, Inc. for Compensation,
   filed June 27, 2011, 5:21.

26    16.   Id., 6:9-13.

27    17.   Id., 6:8-9.

28    18.   Id., 6:14.

1 | financial advisor -- and especially, someone billing at Mr.

2 | Brandt's rate -- should have been so involved on those issues.[19]

3 |     Having closely inspected both firms' billing statements, the

4 | court concludes that there was a significant amount of

5 | duplication of effort and resulting charges, chargeable primarily

6 | to DSI as opposed to the debtors' counsel, and that DSI failed to

7 | balance its efforts and its corresponding fees against the

8 | results likely to be achieved.

9 |     **4.  Overall value of DSI's services**

10 |     DSI argues that "[t]here is no requirement that requested

11 | fees be tied to creditor recovery."  However, a professional in a

12 | bankruptcy case does not have "free reign to run up a tab without

13 | considering the maximum probable recovery."  <u>Unsecured Creditors'</u>

14 | <u>Committee v. Puget Sound Plywood, Inc.</u>, 924 F.2d 955, 958 (9th

15 | Cir. 1991).  On the contrary, a professional proposing to seek

16 | fees under § 330(a) must consider:

17 |         (a) Is the burden of the probable cost of legal
services disproportionately large in relation to the

18 |         size of the estate and maximum probable recovery?

19 |         (b) To what extent will the estate suffer if the
services are not rendered?

20 |

21 |         (c) To what extent may the estate benefit if the
services are rendered and what is the likelihood of the
disputed issues being resolved successfully?

22 |

23 | <u>Id.</u> at 958-59, quoting <u>In re Wildman</u>, 72 B.R. 700, 707 (Bankr.

24 | N.D. Ill. 1987).  In short, the professional has

25 |

26 |     19.  Mr. Brandt's entries during the period January 14 –
April 27, 2010 concerning DSI's first interim fee application are

27 | a prime example.  These charges are summarized in Appendix A
hereto.  There was no need for any of these services to be

28 | performed by a financial advisor, let alone one billing at $615
per hour.

- 14 -

> an obligation to consider the potential for recovery
> and balance the effort required against the results
> that might be achieved.  Absent unusual circumstances,
> an attorney must scale his or her fee at least to the
> reasonably expected recovery.

<u>Puget Sound Plywood</u>, 924 F.2d at 961.

In this case, two factors were at all times in play -- the likely recovery on unsecured claims was known to be approximately two cents on the dollar, and the debtors had competent and experienced counsel.  Given these circumstances, it does not require hindsight to find that DSI could not have made the required cost-benefit analysis and at the same time proceeded to add the extra layer of duplicative administrative expenses it did.  Again, the court disagrees with DSI's remarks at the hearing to the effect that its choices were limited to incurring the fees it did or pulling the plug on the case.  As a third alternative, the court finds that confirmation of the plan might well have been achieved without Mr. Brandt's micromanagement, at a much lower cost in terms of DSI's fees.

**D.  Calculation of Award**

A review of DSI's time and billing, as discussed above, leaves the court with the distinct impression that DSI failed to give sufficient attention to prudent billing judgment, permitted unnecessary duplication of services, unnecessarily micromanaged the case, engaged in overly aggressive billing, and failed to monitor the burden of its fees in relation to the benefits likely to be achieved.  As a result, the estate was exposed to unreasonably high fees, and an across-the-board reduction is appropriate.

/ / /

- 15 -

Evaluation of a professional's fee application under § 330 begins with a determination of the "lodestar" -- multiplying the number of hours reasonably spent by a reasonable hourly rate. Law Offices of David A. Boone v. Derham-Burk (In re Eliapo), 468 F.3d 592, 598 (9th Cir. 2006), citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983) [lodestar method "provides an objective basis on which to make an initial estimate of the value of a lawyer's services."].  But the lodestar approach is not mandatory.  Eliapo, 468 F.3d at 598.  "[I]f a fee application is inadequate, the court should not be forced to wade through it in order to calculate the 'lodestar.'"  Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc., 924 F.2d 955, 961 (9th Cir. 1991). Further, "the court may abandon the lodestar approach when the court cannot reasonably quantify to numerical precision the amount of the fee award."  Lobel & Opera v. United States Trustee (In re Auto Parts Club), 211 B.R. 29, 36 (9th Cir. BAP 1997).

Thus, in Puget Sound Plywood, the bankruptcy court rejected an attorney's request for fees on a lodestar basis and instead awarded one-third of the amount recovered, on the ground that in running up a significant bill, the attorney had failed to exercise billing judgment in light of the likely benefit to the estate.  The Ninth Circuit affirmed.  924 F.2d at 958-59.[20]

In this case, the court will use the lodestar rate as its starting point, noting that Mr. Brandt's hourly rate is at the

20.  See also In re Pacific Express, Inc., 56 B.R. 859, 866 (Bankr. E.D. Cal. 1985) [concluding "that an across-the-board reduction is a necessary and fair expedient to correct for excessive hourly rates, duplicative hours billed and services that were not reasonably necessary . . . ."].

- 16 -

very top end of prevailing rates in this community for similar work. This billing rate assumes a professional who is highly capable of knowing how to properly delegate, manage, and review others' work and how to best use his time in an efficient matter, which in this case, Mr. Brandt did not do. As a result of this and the following other factors, the court will make a percentage reduction from the fees calculated on a lodestar basis.

The reduction is made after considering the following factors. First, Mr. Brandt billed for every service individually at a minimum of one-tenth of an hour -- even up to 60 e-mails in a day and even to the extent of reviewing e-mails that were nothing more than cover sheets transmitting other documents, and even where a particular service or group of services, such as reviewing and responding to an e-mail, actually required, for example, a minute of time. In this fashion, Mr. Brandt has "twisted" the requirement that bankruptcy professionals bill in minimum increments of one-tenth of an hour to enable him to overcharge. This practice makes it difficult for the court to tell which charges should be paid and which should not. Some, but not all, of this time is compensable, but the court cannot make a determination on a line-by-line basis.

Second, the billing records clearly support a conclusion of systematic and extensive unnecessary review by Mr. Brandt of the work of other highly paid professionals. Third, Mr. Brandt micromanaged the case, involving himself in virtually every aspect unnecessarily. The amalgamation of these factors makes it highly impractical for the court to perform a line item by line item reduction. Thus, a reduction of 25% percent is appropriate,

- 17 -

and the court will award DSI a total of $493,759 in fees
($658,346 x .75) and $24,087 in costs.

The court will issue an appropriate order.

Dated: _Aug. 8_ , 2011          _Robert Bardwil_
                                ROBERT S. BARDWIL
                                United States Bankruptcy Judge

APPENDIX A

Between January 14 and April 27, 2010, Mr. Brandt billed for:

(1) reviewing Pierce's e-mails regarding DSI's monthly billings,

(2) discussing with Pierce getting a billing out and organizing and preparing a fee application for DSI,

(3) reviewing an initial draft of a billing and Pierce's notes with respect to the billing,

(4) reviewing an e-mail from Pierce to the debtors and Pino transmitting copies of the billing,

(5) reviewing an e-mail from Pino to Pierce with respect to court dates for the fee applications,

(6) reviewing and making changes to a DSI fee application drafted by Pierce,

(7) checking the math in the fee application,

(8) meeting with Pierce to go over the fee application,

(9) reviewing and signing the fee application,

(10) reviewing Pierce's e-mail transmitting the final signed version, a draft of a proposed order, and the fee application summary sheets,

(11) sending e-mails to the debtors and Pino transmitting the final draft and concerning the fact that it needed to be filed the next week, and discussing whether Pino would file a fee application at the same time,

(12) meeting with Pierce to discuss the timetable for the fee application and to make sure it was on calendar,

(13) reviewing an e-mail from Pierce to Pino's office trying to work out the details of the dates for hearings on the fee applications,

(14) reviewing another e-mail from Pierce to Pino's office regarding the hearings and fee applications,

(15) reviewing another e-mail from Pino's office to Pierce with respect to the fee applications and the local rules with respect to circulating copies of the fee applications,

(16) reviewing another e-mail from Pierce to Pino's office indicating DSI had complied with the local rules but would double check to make sure everyone had signed off,

(17) reviewing e-mails among the debtors, Pierce, and others
regarding the status of the DSI fee application as it was being
circulated, regarding the hearing date, and regarding the
debtors' review and approval of the fee application,

(18) reviewing the debtor's further e-mail indicating he had seen
the fee application earlier, had taken another look at it, and
was fine with it,

(19) reviewing an e-mail from David Haynes, in Pino's office,
with respect to the need for a copy of the fee application in
Microsoft Word to be filed,

(20) reviewing an e-mail from Pierce to Haynes transmitting
revised copies of the fee application,

(21) reviewing another e-mail from Pierce regarding the timetable
for execution of the declarations,

(22) reviewing and approving a draft of the notice of hearing on
the fee application,

(23) e-mailing Pino and Pierce indicating DSI was fine with the
notice of hearing and okay with it going out,

(24) reviewing an e-mail from Pierce with respect to her comments
on the notice of hearing and the status of the declarations,

(25) e-mailing Pierce regarding his review of the notice of
hearing and the status of the declarations,

(26) reviewing a further e-mail from Pierce with respect to her
conversations with Pino's office regarding getting the final
declarations done,

(27) reviewing a further e-mail from Haynes transmitting the
final form of the declaration in support of the fee application
and executing the declaration,

(28) reviewing a series of e-mails between Haynes and Pierce with
respect to minor changes they had made to the fee application,

(29) reviewing an e-mail from Haynes to Pierce with respect to
the logistics of getting the completed fee application original
documentation into the proper files,

(30) reviewing a further e-mail from Pierce to Haynes confirming
arrangements with respect to the delivery of the original
documentation related to the fee application,

(31) reviewing an e-mail from Pino to Brandt and Pierce
indicating that the fee application and all accompanying
documents had been filed with the court,

/ / /

- 20 -

1  (32) reviewing the final forms of the supporting declarations of
   the debtors in support of the fee application, the final form of
2  the notice of hearing, and the proof of service,

3  (33) e-mailing Pino, Pierce, the debtors, and Haynes thanking
   them for their work in getting out the fee application, and
4  confirming the information they had passed out with respect to
   the hearing dates and issues related to the logistics for the fee
5  application process,

6  (34) reviewing an e-mail back from Pino confirming issues related
   to the information she had sent and acknowledging that the fee
7  application was indeed out and her office's work on this matter
   was concluded for now.
8
   Exhibits in support of the Application, Ex. 3, pp. 17-21 of 243.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28